**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BARBARA ANN JONES, | ) | CASE NO. 3:15-CV-645 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Barbara Ann Jones ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"), denying her applications for Period of Disability ("POD") and

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C.

§§ 416(i), 423. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned United States Magistrate Judge pursuant to the

consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the

reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On December 12, 2011, Plaintiff filed her application for POD and DIB, alleging a

disability onset date of September 26, 2011. (Transcript ("Tr.") 13.)  The application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ"). (*Id.*)  On July 23, 2013, an ALJ held Plaintiff's hearing.

(*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.

(*Id.*)  A vocational expert ("VE") also participated and testified. (*Id.*)  On September 25,

2013, the ALJ found Plaintiff not disabled.  (Tr. 28.)  On February 13, 2015, the Appeals

Council declined to review the ALJ's decision, and the ALJ's decision became the

Commissioner's final decision.  (Tr. 1.)  On April 2, 2015, Plaintiff filed her complaint to

challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed

briefing in this case.  (Doc. Nos. 15, 18, 21.)

Plaintiff asserts the following assignments of error: (1) the ALJ failed to properly

evaluate the opinions of Plaintiff's treating physicians[1]; (2) substantial evidence does

not support the ALJ's credibility finding; and (3) substantial evidence does not support

the ALJ's finding that Plaintiff can make the vocational adjustment needed to perform a

full range of light work.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in May 1959 and was 52-years-old on the alleged disability

onset date. (Tr. 26)  She had at least a high school education and was able to

communicate in English. (*Id.*)  She had past relevant work as a central supply worker,

pharmacy technician, and hospital housekeeper. (Tr. 25.)

### B.    Medical Evidence

#### 1.    Medical Reports

In July 2011, Plaintiff presented to her primary care physician, Andrea Bruss,

M.D., with complaints of back pain that radiated into her left hip and leg. (Tr. 327.)  Dr.

---

[1]     Plaintiff asserts that the ALJ failed to properly consider the opinions of her
treating "physicians."  Her arguments, however, address the ALJ's
analysis of only one treating physician, Dr. Bruss.

2

Bruss prescribed pain medication and recommended an MRI. (*Id.*)  An August 2011 MRI showed bulging discs at L3-4, L4-5, and L5-S1; degenerative arthritic changes in the lumbar spine, particularly at L4-5 and L5-S1; facet arthropathy in the lumbar region; various degrees of spinal stenosis and narrowing of the neural foramina from L3-S1; and Grade 1 spondylosisthesis at L5-S1. (Tr. 259.)

In September 2011, Plaintiff returned to Dr. Bruss for severe low back pain radiating into her left leg. (Tr. 336.)  Plaintiff reported that Vicodin and Tramadol did not provide long-lasting pain relief. (*Id.*)  She worked as a housekeeper and the pushing, bending, and mopping involved made her feel poorly by the end of the day. (*Id.*) Her back felt best when laying down. (*Id.*)  Dr. Bruss prescribed Percocet and recommended that Plaintiff continue taking Tramadol. (*Id.*)  The doctor referred Plaintiff to pain management. (*Id.*)

On October 3, 2011, pain management specialist Elizabeth Fowler, M.D., examined Plaintiff. (Tr. 296.)  Dr. Fowler recommended a trial of Neurontin and physical therapy. (Tr. 271.)  The doctor also administered steroid injections. (Tr. 281.)  Later that month, Plaintiff reported that the injections lessened her pain, although an ache in her left leg and some pain in her lumbar spine persisted. (Tr. 463.)  On examination Plaintiff's straight leg raising was positive on the left and right. (*Id.*)  Dr. Fowler suggested that Plaintiff return to work. (Tr. 464.)  An October 2011 EMG yielded normal results and showed no peripheral neuropathy, radiculopathy or muscle disease to account for Plaintiff's symptoms. (Tr. 257.)

Plaintiff began physical therapy in November 2011. (Tr. 272.)  During a

November session, Plaintiff indicated that her pain was reduced by 40 percent. (Tr. 380.)  From November through December 2011, Plaintiff cancelled or did not attend four therapy sessions. (Tr. 375, 377, 378, 379.)  Plaintiff's physical therapist discharged her in February 2012 for failure to attend appointments. (Tr. 380.)

In December 2011, Plaintiff returned to Dr. Fowler and reported that she had "excellent improvement of her pain" following a November 2011 steroid injection and with her medication. (Tr. 277.)  Plaintiff stated that she felt "like a human again." (*Id.*)  She denied radicular pain, was able to walk for long periods of time, was able to start doing housework, and was on her way to returning to her job. (*Id.*)  On physical examination Plaintiff's straight leg raising tests were negative, her strength was intact, and she had mild tenderness in her sacroiliac joints. (*Id.*)  Dr. Fowler explained that Plaintiff had responded well to pain management and conservative therapy. (*Id.*)  The doctor instructed Plaintiff to continue with her present proactive lifestyle and encouraged her to return to work. (*Id.*)

During January 2012, Dr. Fowler administered bilateral sacroiliac joint injections, and Plaintiff began using a TENS unit. (Tr. 317, 411, 434.)  On February 6, 2012, Plaintiff returned to Dr. Bruss. (Tr. 393.)  Plaintiff's TENS unit helped her sleep and perform activities of daily living, like washing dishes and vacuuming. (*Id.*)  Dr. Bruss diagnosed lumbar degenerative disc disease with radiculopathy and recommended that Plaintiff return to physical therapy. (*Id.*)

In March 2012, Plaintiff reported to Dr. Fowler that her TENS device resulted in a 40 percent improvement in her pain. (Tr. 357.)  She also indicated, however, that she

4

continued to experience severe pain in the left and right buttocks radiating down into her groin and thigh. (*Id.*)  During a physical examination Plaintiff's sensation and muscle strength in her lower extremities was normal. (Tr. 358.)  Her gait was steady, though her sacroiliac joints were somewhat tender. (Tr. 368-59.)  Her straight leg raising test was negative. (Tr. 359.)

A May 2012 MRI of the lumbar spine showed edema and disc space narrowing at L4-5. (Tr. 421.) The MRI also revealed asymmetric disc bulging and moderately severe neural foraminal narrowing at L4-5. (*Id.*)  In May 2012, Plaintiff reported to Dr. Fowler that her medication reduced her pain significantly, but she still could not function at her current pain level. (Tr. 405.)  Following a physical examination, Dr. Fowler opined that Plaintiff had a normal range of motion in the lumbar spine with good forward flexion. (*Id.*)  Dr. Fowler explained that Plaintiff's recent MRI showed some slight progression of spinal stenosis at L4-5 on the right causing increased right leg symptoms. (Tr. 406.) The doctor referred Plaintiff to neurologist Patrick McCormick, M.D. (*Id.*)

In July 2012, Plaintiff told Dr. Bruss that her radiating low back pain persisted. (Tr. 562.)  She could not sit, stand, or walk for long periods of time and the most weight she could carry was a light grocery bag. (*Id.*)  She could no longer vacuum and her husband did much of the housework and prepared meals. (*Id.*)  Dr. Bruss noted that Plaintiff planned to see Dr. McCormick. (*Id.*)

On July 25, 2012, Dr. Bruss completed a medical assessment of Plaintiff's ability to perform work-related activities. (Tr. 529-31.)  Dr. Bruss opined that Plaintiff could lift

and carry less than ten pounds. (Tr. 529.)  She could stand for up to ten minutes, walk

for up to 30 minutes, and sit for up to ten minutes. (*Id.*)  She required an at-will option to

shift from sitting to standing. (Tr. 530.)  Plaintiff could occasionally climb, balance,

stoop, crouch, kneel, and crawl. (*Id.*)  She could perform reaching as long as it did not

require her to bend at the waist. (*Id.*)  Plaintiff could never push or pull, and she must

avoid exposure to heights, moving machinery, and vibration. (*Id.*)  In support of these

limitations Dr. Bruss wrote the following:

- Plaintiff had severe back pain that radiated into her hip and legs, as well as numbness, tingling, and weakness in her legs that was continuously present but worsened by any activity. (Tr. 529.)

- A May 2012 MRI of the lumbar spine showed disc space narrowing at L4-5 along with disc bulging and moderate to severe neuroforaminal narrowing at L5-S1. (*Id.*)

- Plaintiff underwent injections and physical therapy, neither of which provided relief. (*Id.*)  Plaintiff required pain medications and a TENS unit. (*Id.*) Even with pain medications, Plaintiff rated her pain at a level "8 or 9" out of "10." (*Id.*)

- Plaintiff was going to a neurosurgeon to evaluate whether surgery would provide relief. (*Id.*)

- On examination Plaintiff's lumbar spine muscles were tender to palpation, her gait was unsteady, her range of motion in the back was restricted, she had difficulty balancing on one foot, and her straight leg raising test was positive bilaterally. (*Id.*)

On July 30, 2012, Plaintiff presented to Dr. McCormick for a surgical

consultation. (Tr. 533.)  Dr. McCormick noted that Plaintiff's MRI showed narrowing of

the L5-S1 neural foramen and some possible irritation of the L5 nerve root. (Tr. 534.)

The doctor recommended surgical decompression at L5-S1 in an attempt to relieve

radicular symptoms. (Tr. 534-35.)  The operation likely would not alleviate Plaintiff's low

back pain, which Dr. McCormick opined was related to spondylosis. (Tr. 535.)  Dr.

McCormick performed the spinal surgery on August 24, 2012. (Tr. 545.)

On October 3, 2012, Plaintiff reported to Dr. McCormick that she was doing very

well and had good relief of her neurogenic pain. (Tr. 587.)  Her only complaint was that

she experienced tingling, dysesthetic symptoms at night when trying to fall asleep. (*Id.*)

During a physical examination, Plaintiff's straight leg raising tests were negative, and

her strength, sensation, and reflexes were normal. (*Id.*)  Dr. McCormick opined that

Plaintiff's symptoms would lessen over time, prescribed Neurontin for nighttime

symptoms, and recommended that Plaintiff dovetail from physical therapy into a

dedicated program of weight loss and core strengthening. (*Id.*)  That same day, Plaintiff

reported to Dr. Bruss that her back was "pretty good," she was not taking pain

medication, and she had mowed her lawn, which caused her back to hurt the following

day. (Tr. 593.)

In November 2012 Plaintiff reported to Dr. Bruss that she was helping her

husband with a building project when a piece of wood hit her in the face and caused a

black eye. (Tr. 592.)  During December 2012 Plaintiff reported to Dr. Bruss that she was

"a lot better" since her surgery and more functional. (Tr. 602.)  Gabapentin and

Ibuprofen managed her remaining low back pain. (*Id.*)  Neurontin helped to alleviate the

tingling sensation she experienced at night. (*Id.*)  Plaintiff could walk longer distances,

but being on her feet and standing caused a new tingling sensation and low back pain

that radiated into her right thigh. (*Id.*)  On physical examination, Plaintiff was able to

walk on her tiptoes and heels, but was weaker on the right side with plantar flexion and

7

extension. (*Id.*)  She had a positive straight leg raising test on the right and generalized weakness in the right leg. (*Id.*)  Her forward bending was much improved as compared to before the surgery. (*Id.*)  Dr. Bruss prescribed pain medication and requested Dr. McCormick's opinion as to whether more than pain management was needed for Plaintiff's new symptoms. (*Id.*)

Plaintiff began physical therapy on December 10, 2012. (Tr. 610.)  That month she cancelled or failed to attend a number of physical therapy sessions without reason. (Tr. 611-16.) One cancellation notice indicated that Plaintiff felt physical therapy was not helping. (Tr. 611.)  Plaintiff's physical therapist discharged her on January 30, 2013, for nonattendance. (Tr. 608.)

In February 2013 Plaintiff reported to Dr. Bruss that she experienced a burning, radiating pain in her right thigh the longer she was on her feet. (Tr. 651.)  On physical examination, Plaintiff's gait was stable and her range of motion was "a little" limited due to pain. (*Id.*)

Plaintiff's March 2013 lumbar spine MRI showed degenerative changes in the lower lumbar spine, more prominent at L4-5 and L5-S1. (Tr. 644.)  There was a moderate disc bulge causing moderate neural foraminal narrowing on the right and mild narrowing on the left with mild spinal stenosis at L5-S1. (*Id.*)  The MRI also revealed an extruding disc encroaching on the L5 nerve root. (*Id.*)

Plaintiff returned to Dr. McCormick in April 2013. (Tr. 641.)  She reported that increasing low back pain was causing "significant degradation" in her functional capacity. (*Id.*)  Plaintiff described radiating pain in her right leg that was aggravated by

8

weight bearing, coughing, and sneezing. (*Id.*)  During a physical examination, Plaintiff exhibited give-way weakness in her right hip flexor secondary to pain and her lumbar spine range of movement was sharply limited. (Tr. 642.)  Dr. McCormick discussed surgical and non-surgical options. (Tr. 643.)  Plaintiff wanted to pursue non-surgical treatment, including physical therapy, epidural steroid injections, and pain management, before surgery. (*Id.*)

### 2.  Agency Reports

On January 31, 2012, state agency physician Bradley Lewis, M.D., conducted a review of the record. (Tr. 89-92.)  He opined that Plaintiff could occasionally lift up to 50 pounds and frequently lift up to 25 pounds; stand, walk, or sit for approximately six hours in an eight-hour workday; occasionally stoop, crouch, and climb; and frequently crawl. (Tr. 91-92.)

In April 2012 state agency physician Eli Perencevich, D.O., reviewed the record. (Tr. 101-03.)  He opined that Plaintiff could occasionally lift up to 20 pounds and frequently lift up to 10 pounds; stand, sit, or walk for approximately six hours in an eight-hour workday; occasionally stoop, crouch, and climb; and frequently crawl. (Tr. 101-02.)

On July 9, 2013, state agency physician William Padamadan, M.D., performed a physical examination of Plaintiff. (Tr. 658-70.)  Plaintiff explained that she had spinal surgery in August 2012. (Tr. 658.)  She was taking Vicodin and Tramadol for continued back pain that she rated at an intensity of six out of ten. (*Id.*)  During the examination, Plaintiff displayed a good range of motion in her hips, knees, and ankles. (Tr. 659.)  Her gait was normal. (*Id.*) Dr. Padamadan opined that Plaintiff could lift and carry up to 20

pounds continuously and 50 pounds occasionally. (Tr. 665.) She could sit for a total of eight hours and stand or walk for a total of six hours. (Tr. 666.)  Plaintiff could occasionally push or pull and continuously reach, handle, finger, or feel. (Tr. 667.)  She could never climb stairs, ramps, ladders, or scaffolds. (Tr. 668.)  She could occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*)  Dr. Padamadan also recommended environmental limitations. (Tr. 669.)

**C.      Hearing Testimony**

      **1.      Plaintiff's Hearing Testimony**

Plaintiff testified that she could not work because she was unable to sit or stand for any extended period of time. (Tr. 61.)  She needed to recline every half-hour to relieve her pain. (*Id.*)  Plaintiff experienced burning and weakness in her legs when standing and had fallen on several occasions. (*Id.*)  She became extremely uncomfortable when sitting and was unable to concentrate due to her pain. (*Id.*)  She could sit or stand for approximately 15 minutes before she needed to change positions or recline. (Tr. 62.)  She could walk approximately two acres before she had to stop and rest. (Tr. 61-63, 66.)  She could occasionally bend, stoop, and squat. (Tr. 62.)  Plaintiff could drive a car for up to 20 minutes. (Tr. 57.)

Following her August 2012 spinal surgery, Plaintiff experienced a short period of relief in pain and symptoms, but a burning and stabbing back pain eventually returned. (Tr. 65-66.)  At the time of the hearing, Plaintiff could not afford medical care because her husband lost his job eight months prior and they were uninsured. (Tr. 65.)  She was taking Vicodin, Aspirin, and Lyrica, which helped to reduce her pain but caused fatigue

10

and dizziness. (Tr. 67-68.)

Plaintiff had "good days and bad days." (Tr. 73.)  On good days, she performed personal hygiene in the morning and gardened. (*Id.*)  Her husband had designed a pad that she laid on to pull weeds from flower beds. (*Id.*)  She also read, watched television, periodically visited her father, folded laundry, and cooked simple meals mostly while sitting at her kitchen table. (Tr. 74.)  On bad days, Plaintiff did not want to get out of bed due to her pain. (Tr. 75.)  Four days out of the week were bad days. (*Id.*)

Plaintiff testified that her examination with consultative examiner, Dr. Padamadan, was ten minutes long. (Tr. 84.)  She told Dr. Padamadan that she had back surgery but did not have a opportunity to explain how her symptoms had worsened thereafter or the nature of her radiating pain. (*Id.*)  At the end of the examination, Dr. Padamadan asked Plaintiff if she had anything to add, but Plaintiff had not realized that his question signaled the end of their time together. (*Id.*)

### 2.     Vocational Expert's Hearing Testimony

Jacquelyn Schabacker, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 78.)  The individual could perform light work, but could never climb ladders, ropes, or scaffolds. (*Id.*)  The individual could occasionally balance, stoop, kneel, crouch, and crawl; frequently use her bilateral lower extremities to operate foot controls; and occasionally use her upper extremities for pushing, pulling, and operating hand controls. (*Id.*)  The individual must avoid all exposure to unprotected heights and avoid concentrated exposure to moving machinery. (*Id.*)  The VE testified

11

that the individual would be able to perform Plaintiff's past relevant work as a pharmacy technician, in addition to such jobs as a photocopy machine operator, a routing clerk, and an inspector (Tr. 78-79.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a

12

severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirement of the Social Security Act through December 31, 2015.

2.    The claimant has not engaged in substantial gainful activity since September 26, 2011, the alleged onset date.

3.    The claimant has the following severe impairments: degenerative disc disease status post lumbar forminectomy, arthritis, obesity, osteoarthritis of the right knee, bilateral plantar fascitis, chronic Achilles tendonitis, and heel bursitis.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except: Postural limitation of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs.  Occasional balancing, stooping, kneeling, crouching, and crawling. Frequent use of the bilateral lower extremities for operation of foot controls. Manipulative limitation of

occasional use of the bilateral upper extremities for pushing and pulling, and operation of hand controls on an occasional basis. Environmental limitation to avoid all exposure to unprotected heights. Avoid concentrated exposure to moving machinery.

6.      The claimant is capable of performing past relevant work as a pharmacy technician. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.      The claimant has not been under a disability, as defined in the Social Security Act, from September 26, 2011, through the date of this decision.

(Tr. 15-27.)

## V.  LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported

14

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignments of Error**

   **1.      The ALJ's Treating Physician Analysis**

Plaintiff argues that the ALJ erred in assigning only little weight to the opinion of her treating physician, Dr. Bruss.  According to Plaintiff, the reasons the ALJ provided in support of his decision to discount Dr. Bruss's residual functional capacity (RFC) opinion were not supported by the evidence.  Dr. Bruss issued her opinion in July 2012, two months prior to Plaintiff's spinal surgery.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make

15

clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)). This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted). Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand. *Id.*

Here, the ALJ analyzed Dr. Bruss's July 2012 opinion but concluded that it was not entitled to controlling weight because the opinion was "quite conclusory, providing very little explanation of the evidence relied on in forming [the] opinion." (Tr. 23.) Plaintiff contends that Dr. Bruss described the symptoms and medical findings that formed the basis for her opinion. On the medical assessment form, Dr. Bruss did provide some justification for her findings. (Tr. 529.) Dr. Bruss relied primarily on Plaintiff's subjective complaints but also described the results of a 2012 MRI and findings from physical examinations before Plaintiff's spinal surgery. (*Id.*)

Nonetheless, the ALJ provided additional good reasons for discounting Dr. Bruss that are substantially supported by the record. The ALJ explained that the extreme limitations Dr. Bruss assigned were not supported by Dr. Bruss's treatment notes. In his opinion the ALJ thoroughly discussed Dr. Bruss's treatment notes that spanned the relevant period and highlighted the following:

• During February 2012, Dr. Bruss indicated that Plaintiff's TENS unit relieved

16

her pain and allowed her to wash dishes and vacuum. (Tr. 20.)

•   In October 2012, Dr. Bruss noted that Plaintiff's back was "pretty good" following her August 2012 spinal surgery, and she was not taking any pain medication.  Plaintiff reported that she was able to mow her lawn, and her pain was a four on a scale of ten. (*Id.*)

•   In December 2012, Plaintiff reported to Dr. Bruss that things were "a lot better" than before her spinal surgery.  Although being on her feet and standing caused a tingling sensation in her back to occur more often, Plaintiff could walk longer distances.  Dr. Bruss also noted that Plaintiff was able to manage her back pain with medication.  On examination, Plaintiff could walk on her tiptoes and heels and her forward bending was much improved as compared to before the surgery. Dr. Bruss treated Plaintiff conservatively with only medication. (*Id.*)

•   In February 2013, Plaintiff reported to Dr. Bruss that she experienced a burning, radiating pain into her right thigh that worsened when she was on her feet.  During a physical examination, however, Dr. Bruss observed that Plaintiff had no atrophy and her gait was stable.  Dr. Bruss also noted that Plaintiff's back range of motion was only "a little bit" limited due to pain. (*Id.*)

The ALJ's analysis and discussion of the evidence demonstrates that Dr.

Bruss's treatment notes, particularly those following Plaintiff's spinal surgery, did not

support the serious limitations that Dr. Bruss recommended.[2]  Accordingly, the ALJ's

treating source analysis is substantially supported, and Plaintiff's first allegation of error

fails.

_____

[2]     Plaintiff takes issue with ALJ's reliance on consultative examiner Dr. Padamadan, because the physician conducted only a brief examination on one occasion and was not fully aware of the extent of Plaintiff's spinal impairment.  The opinions of state agency medical consultants regarding the nature and severity of an individual's impairments constitute expert opinion evidence upon which an ALJ may rely, however.  *See* S.S.R. 96-6p, 1996 WL 374180, at *1 (S.S.A.).  In appropriate circumstances, opinions from these medical sources may be entitled to greater weight than the opinions of treating sources. *Id.*  Here, as the ALJ gave good reason for discounting Dr. Bruss's opinion, he was permitted to rely on the opinions of other medical sources like Dr. Padamadan.

17

### 2. The ALJ's Credibility Analysis

Plaintiff also contends that the ALJ erred in discounting her credibility. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, the ALJ's credibility determinations must be reasonable and based on evidence from the record. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).   Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

When a claimant complains of disabling pain, the Commissioner must apply a two-step test known as the "Duncan Test" to determine the credibility of such complaints.  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  First, the Commissioner must examine whether the objective medical evidence supports a finding of an underlying medical condition that could cause the alleged pain.  *Id.*  Second, if there is such an underlying medical condition, the Commissioner must

examine whether the objective medical evidence confirms the alleged severity of pain, or, alternatively, whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged severity of pain. *Id.* In making this determination, the ALJ must consider all of the relevant evidence, including six different factors.  *See Felisky,* 35 F.3d at 1039-40 (citing 20 C.F.R. § 404.1529(c)).  Courts are not required to discuss all of the relevant factors; an ALJ may satisfy the Duncan Test by considering most, if not all, of the relevant factors.  *Bowman v. Chater,* 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).

Here, a review of the ALJ's decision reveals that the ALJ discussed most, if not all, of the relevant factors in his assessment of Plaintiff's condition. (Tr. 18-25.)  The ALJ examined Plaintiff's daily activities, treatments and her responses to those treatments, the clinical examination findings, and the physicians' statements of record. (*Id.*)  Despite Plaintiff's contention to the contrary, the ALJ considered and discussed in detail the results of Plaintiff's March 2013 MRI. (Tr. 20.)

Additionally, the ALJ provided reasonable grounds for finding Plaintiff's complaints of disabling pain less than credible.  For example, the ALJ explained:

- Plaintiff's daily activities were not limited to the extent one would expect, given her complaints of disabling symptoms and limitations.  In October 2012 Plaintiff mowed the law, and one month later, she helped her husband with a building project.  Plaintiff testified that she was able to drive and perform personal hygiene without assistance.  During a consultative psychological examination, Plaintiff reported that she was largely able to engage in activities of daily living. (Tr. 24-25.)[3]

---

[3]     Plaintiff argues that the ALJ ought to have developed the record as to the extent of physical effort she expended on these activities.  Plaintiff points

- Although Plaintiff received various forms of treatment that would normally weigh somewhat in her favor, the record also revealed that the treatment had been generally successful in controlling her symptoms.  For example, by October 2012, Dr. Bruss noted that Plaintiff's back was "pretty good" and Plaintiff was not taking pain medication.  Plaintiff reported that her pain was only a four on a scale of ten.  In December 2012, Plaintiff reported that she was "a lot better" since her spinal surgery, and Dr. Bruss noted that Plaintiff was able to manage her pain with medication.  In February 2013, Dr. Bruss observed that Plaintiff had no atrophy, her gait was stable, and the range of motion in her back was only "a little bit" limited due to pain. (Tr. 25.)

- Plaintiff complained of new pain following her August 2012 spinal surgery. (Tr. 20-22.)  Despite this pain, Plaintiff wished to pursue non-surgical treatment in the form of physical therapy, epidural steroid injections, and pain management before turning to surgical options. (Tr. 22.)

- Plaintiff was noncompliant with physical therapy, cancelling or failing to attend a number of sessions.  In February 2012 and again in January 2013, Plaintiff's physical therapist discharged her due to nonattendance. (Tr. 22.)[4]

As the ALJ adequately considered Plaintiff's symptoms and discussed most of the

relevant factors, which substantially support the decision to discount Plaintiff's

credibility, Plaintiff's second assignment of error does not present a basis for remand.

───────────────

to no authority to support this contention. Moreover, Plaintiff was represented at the hearing.  Plaintiff's counsel had an adequate opportunity to question Plaintiff about her activities. Thus, Plaintiff's argument is not well taken.

[4]     Plaintiff argues that the ALJ failed to note that Plaintiff did not attend physical therapy because she felt it was not beneficial and increased her pain.  Plaintiff directs the Court to only one physical therapy note indicating that Plaintiff felt treatment was not helpful. (Tr. 611.)  Plaintiff points to no evidence showing that therapy caused pain.  Plaintiff cancelled one appointment due to illness and another due to a conflict. (Tr. 375, 377.)  The record otherwise indicates that Plaintiff failed to attend therapy without justification and her therapist discharged her twice for non-attendance. (Tr. 378-80, 608, 612-16.)  Accordingly, the record substantially supports the ALJ's reasoning with regard to Plaintiff's noncompliance.

### 3.     The ALJ's Step Five Finding

In her final assignment of error, Plaintiff contends that accepting Dr. Bruss's opinion results in a finding of disability under the Medical Vocational Rules.  Plaintiff contends that the ALJ's conclusion at Step Five is not supported by substantial evidence as a result.  Plaintiff's argument is not well taken.

As previously discussed, the ALJ's treating source analysis is substantially supported.  Accordingly, the ALJ was not required to adopt Dr. Bruss's opinion, and the physician's RFC does not undermine the ALJ's step five finding.

## VI.     CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: December 17, 2015

21